UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ALMA E. CHAPMAN,                    :
                                    :CIVIL ACTION NO. 3:18-CV-723
            Plaintiff,              :
                                    :(JUDGE CONABOY)
            v.                      :
                                    :
NANCY A. BERRYHILL,                 :
Acting Commissioner of             :
Social Security,                    :
                                    :
            Defendant.              :
                                    :

---

## MEMORANDUM

Pending before the Court is Plaintiff's appeal from the Acting Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act") and Supplemental Security Income ("SSI") under Title XVI of the Act.  (Doc. 1.) Plaintiff protectively filed applications on September 3, 2015, alleging disability beginning on February 1, 2014.  (R. 21.)  After Plaintiff appealed the initial December 22, 2015, denial of the claims, a hearing was held by Administrative Law Judge ("ALJ") Daniel Balutis on August 2, 2017.  (*Id.*)  ALJ Balutis issued his Decision on September 20, 2017, concluding that Plaintiff had not been under a disability, as defined in the Act from February 1, 2014, through the date of the Decision.  (R. 29.)  Plaintiff requested review of the ALJ's decision which the Appeals Council denied on February 15, 2018.  (R. 1-7.)  In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 1.)

Plaintiff filed this action on April 3, 2018. (Doc. 1.) She asserts in her supporting brief that the Acting Commissioner's determination should be remanded because the ALJ erred in his assessment of medical expert opinions which limited Plaintiff to sedentary or less-than-sedentary work and substituted his lay judgment for these opinions. (Doc. 9 at 5.) For the reasons discussed below, the Court concludes Plaintiff's appeal is properly granted.

## I. Background

Plaintiff was born in February 1957 and was sixty years old at the time of the ALJ's decision. (Doc. 9 at 2.) She has a high school education and worked as a dental assistant and later a phlebotomist. (*Id.*) When She applied for benefits, Plaintiff alleged that her ability to work was limited by problems with weight-bearing joints, anxiety, and depression. (R. 191.)

### A. *Medical and Opinion Evidence*

On September 16, 2013, Plaintiff saw Donald D. Golobek, D.O., at Susquehanna Health Orthopedics at Wellsboro with complaints of worsening knee pain. (R. 249.) Examination showed right knee effusion, tenderness to palpation, and ligament laxity. (R. 250.) Dr. Golobek diagnosed severe degenerative joint disease with a recent twist/sprain. (*Id.*) Dr. Golobek treated Plaintiff with steroid injections (R. 251) but the relief lasted only three days and she reported that her pain was worse on September 24, 2013.

(R. 252.)

A September 24, 2013, MRI of the right knee resulted in the following Impression:

> erosive degenerative changes particularly about the lateral aspect of the knee joint with areas of osteonecrosis involving the distal lateral femoral condyle as well as the proximal lateral tibial plateau. Erosion of the misisci. Atretic cruciate ligaments. Knee joint effusion. Complex Baker's cyst and aspiration of this complex cyst may be considered.

(R. 291.)

Plaintiff reported improvement on October 21, 2013, after a series of injections. (R. 262.) She was wearing a brace at the time and requested pain medication but she told Dr. Golobek that she wanted to go back to work. (*Id.*) Dr. Golobek limited her to working four-hour shifts and planned to start physical therapy. (*Id.*)

In January 2014, Plaintiff reported continuing knee pain and Dr. Golobek discussed whether her pain warranted knee replacement surgery. (R. 266.) Plaintiff said she would think about it. (*Id.*) Dr. Golobek recorded that Plaintiff was to continue her four-hour work days and therapy twice weekly. (*Id.*)

Dr. Golobek performed a total right knee arthroplasty on February 25, 2014. (R. 281.) Plaintiff noted some stiffness on March 31, 2014, but reported that physical therapy was going well. (R. 273.) On April 2, 2014, Dr. Golobek noted x-rays showed a

well-fixed total condylar knee in excellent position.  (R. 276.)
He reported a well-healed scar, good quad control, and good VMO
recruitment.  (*Id.*)  Dr. Golobek planned for Plaintiff to continue
therapy twice weekly and noted he would be working on getting her
back to work shortly and gradually ease her from the four-hour days
to eight-hour days.  (*Id.*)

At her May 28, 2014, visit with Dr. Golobek, Plaintiff
requested to go back to work full-duty and he noted she was "doing
excellent."  (R. 278.)  Dr. Golobek acceded to Plaintiff's request
for a Percocet prescription, noting it would be the last one.
(*Id.*)  He noted that he saw no reason to restrict her in any way
and would see her back in three months.  (*Id.*)

Plaintiff saw Dr. Golobek again on August 20, 2014, at which
time he noted she was happy, doing everything she needed to do,
moving her knee with no pain, and she had good muscle strength
testing of 5/5.  (R. 279.)  He planned to see her in a year.  (*Id.*)

In April 2015, Plaintiff was seen by Sally Yoder, CNP, at
Guthrie for her annual exam.  (R. 300.)  Ms. Yoder recorded that
Plaintiff had no complaints and no problems were noted on physical
exam.  (R. 301-02.)

On September 30, 2015, Plaintiff was again seen by Ms. Yoder
with complaints of knee pain.  (R. 303.)  In the "Review of
Systems" section of the office notes, Ms. Yoder stated "[s]he is
very confusing.  She seems to believe she can get disability

4

because her knee aches.  She is a trained phlebotomist unable to get a job." (R. 304.)  Objectively, Ms. Yoder noted that Plaintiff had many varicose veins and reported that her legs got tired by the end of the day; Plaintiff had no edema in the legs; and she "ramble[d] on and on about getting disability." (*Id.*)  Ms. Yoder planned to get the replacement checked and assessed "leg problems" and "very confusing conversation." (R. 304.)

On October 5, 2015, Dr. Golobek completed a Medical Opinion Re: Ability to Do Physical Activities.  (R. 318-20.)  He found the following: Plaintiff could sit for twenty minutes continuously and for two hours total in an eight-hour day; she could stand for fifteen minutes continuously and for less than two hours in an eight-hour day; she would need a job which permitted shifting positions at will; she would need unscheduled breaks four times per day; she could occasionally lift ten pounds and never lift over that; she could bend and twist at the waist twenty-five percent of a work day; she had to avoid exposure to all identified conditions/substances; she could occasionally twist, stoop (bend), crouch, and climb stairs, and she could never climb ladders; and she would likely be absent from work about once a month due to her impairments or treatment.  (*Id.*)

Right knee x-rays done on November 9, 2015, showed the prosthesis was in good alignment, no acute abnormality was demonstrated, and there was no significant change since June 2014.

5

(R. 497.)

Gilbert Genouri, M.D., conducted an Internal Medicine Examination on referral of the Bureau of Disability Determination on November 23, 2015. (R. 322.) Plaintiff reported difficulty with her right knee, including continued pain which she rated at 5 to 10/10 and said was precipitated by activity. (*Id.*) She also reported occasional low back pain which she said occurred daily and rated at 5 to 10/10. (*Id.*) Dr. Jenouri found Plaintiff was unable to heel or toe walk, could squat to 50%, and had a positive straight-leg raise test on the right side demonstrating lumbar radiculopathy. (R. 323-24.) He opined that Plaintiff could occasionally lift/carry twenty pounds and frequently lift/carry ten pounds; and in an eight-hour day she could sit for two hours, stand for one hour, and walk for one hour total. (R. 327.) He attributed lifting limitations to her knee and low back pain as well as decreased range of motion. (R. 326.)

On January 29, 2016, Dr. Golobek opined that Plaintiff could sit for thirty minutes at one time and for a total of one hour in a workday; she could stand for thirty minutes at a time and for a total of one hour in a workday; she needed to be able to shift positions at will; she would need unscheduled fifteen minute breaks every one and a half to two hours; she could occasionally lift/carry twenty pounds and frequently lift/carry ten pounds; she could frequently twist; she could occasionally stoop, crouch, and

climb stairs; she could never climb ladders; and she should avoid exposure to all identified substances. (R. 336-38.)

On February 15, 2016, Plaintiff saw Dr. Golobek with complaints of pain and said her post-operative symptoms had resolved and she was tolerating daily activities. (R. 502.) She said she was not walking normally, she had difficulty navigating stairs, and her difficulty walking progressed through the day. (*Id.*) Plaintiff also reported some back pain. (*Id.*) Dr. Golobek planned to get a bone scan to check for inflammation or prosthetic loosening. (*Id.*) A lumbar x-ray done on the same day showed disc space narrowing and subluxations at L3 and L5 levels. (R. 496.) A bone scan done on February 17, 2016, showed very mild increased radiopharmaceutical activity involving the interface between the tibial component of the right knee arthroplasty and the right knee and presumed degenerative tricompartmental activity of the left knee. (R. 495.)

On March 7, 2016, Plaintiff saw Dr. Golobek for follow up of her right knee problem. (R. 498.) Plaintiff reported 8/10 pain and said that walking up and down stairs was nearly impossible for her. (*Id.*) She said the onset had been two to three months before. (*Id.*) Dr. Golobek said he did not know "where to go from here" and wanted Plaintiff to get a second opinion with Michael Hoffman, M.D. (*Id.*)

Plaintiff was evaluated by Dr. Hoffman of Susquehanna Health

in Williamsport on April 7, 2016. (R. 474.) Examination findings included active painful range of motion; gait "valgus thrust, ankle pronation"; mild effusion on the right; and diffuse tenderness. (R. 476.) Dr. Hoffman assessed chronic pain of both knees for which he planned further diagnostic evaluations; primary osteoarthritis of the left knee; and instability of the prosthetic knee. (R. 477.) Regarding the right knee, Dr. Hoffman said he discussed treatment options with Plaintiff which included "using a cane, brace vs revision knee replacement." (*Id.*) He noted that Plaintiff elected to proceed with surgery and would call if she wanted to schedule it. (*Id.*)

Plaintiff had right-knee revision surgery on June 13, 2016. (R. 466.) At her four-week post operative visit, Dr. Hoffman noted that Plaintiff was "doing excellent," walking with a cane for stability, and had great range-of-motion. (*Id.*) In August, Dr. Hoffman noted that Plaintiff was doing very well, she could progress activity as tolerated, continue physical therapy, and follow up one year postop. (R. 464.)

In September 2016, Plaintiff reported to Dr. Hoffman that she was very happy with the results of the right knee revision and her left knee was the main concern at that point. (R. 459.) She said she was unable to weight-bear on it. (*Id.*) Dr. Hoffman administered an injection in her left knee and planned to repeat as needed in three months. (R. 461.) In October, Plaintiff said the

8

injection had not helped and over-the-counter NSAIDs and Tylenol were not helpful for the "horrible" left knee pain. (R. 455.) Dr. Hoffman planned to proceed with a left knee replacement. (R. 457.)

Plaintiff had left knee replacement surgery in January 2017. (R. 364.) Dr. Hoffman later found a well-healed incision, with range-of-motion from 0 to 120 degrees on flexion, and good varus-vulgas stability. (R. 444.)

On March 13, 2017, Plaintiff was seen by Larry Gearhard, PA-C, at Susquehanna Health Orthopedics and Rheumatology in Williamsport for lumbar spine pain which she rated at a severity level of seven. (R. 437.) She described the pain as throbbing and radiating down her legs and said it was aggravated by standing and walking. (*Id.*) On physical exam, Mr. Gearhard noted "when performing log roll . . . patient did have shooting (burning/electric) pain up the hamstrings L>R and the low back was tender to palpation." (R. 439.) He reported that Plaintiff had an antalgic gait and she was hunched over at the waist assisted with a walker. (*Id.*) Mr. Gearhard, under the supervision and review of Dr. Hoffman, planned to order further diagnostic evaluations of the lumbar spine. (R. 440.) He assessed spondylolisthesis at L5-S1 level, noting "60-70% anterolisthesis of L5 on S1 dramatically increased since previous plain films one year prior." (*Id.*) Mr. Gearhard ordered a lumbar spine MRI after which he would refer Plaintiff to Ronald E. DiSmone, M.D., of Susquehanna Health Orthopedics for follow-up.

(*Id.*)  He also planned to refer her to Dr. DiSimone for the assessed radiculopathy of the lumbar region.  (*Id.*)

Plaintiff saw Dr. DiSimone on April 19, 2017, for the lumbar spine pain.  (R. 385.)  Examination showed lumbar spine tenderness, tender right sciatic notch, and mildly positive Patrick's test on the right.  (R. 388.)  Dr. DiSimone assessed spondylolisthesis at L5-S1, spinal stenosis in the lumbar region with neurogenic claudication, and radiculopathy of the lumbosacral region.  (*Id.*) He planned to refer Plaintiff to pain management specialist Rohit Singh, M.D., for evaluation of the back and leg pain with walking intolerance and also to refer her to physical therapy.  (*Id.*) Regarding radiculopathy, Dr. DiSimone recorded the following diagnostics: March 13, 2017, lumbar spine films showed Grade 1 unstable L5-S1 spondylolisthesis with a degenerative scoliosis on the AP and sclerosis of both SI joints; anterolisthesis that appeared stable at L3-4 in the lateral projection; March 21, 2017, MRI showed anterolisthesis L5-S1 with minimal neural foraminal stenosis bilaterally right greater than left; and MRI showed numerous disc bulges centrally L2-3, L3-4, L4-5 without significant central or neural foraminal stenosis.  (R. 388.)  He assessed grade 1 mildly unstable 5 S1 spondylolisthesis, lumbar spine canal stenosis with pseudoclaudication; and degenerative lumbar scoliosis.  (*Id.*)  In addition to medication, Dr. DiSimone recorded the following Patient Plan:

> Neurontin 200 mg nn qid. In lieu of formal
> PT at this time, will do a stationary bike
> for lower extremity strength testing.
> Patient's standing and walking tolerance is
> so poor, she is available for only limited
> duty and sedentary work. No more than 5
> pounds lifting, 5 pound push pull,
> intermittent sit/stand/walk. No climbing, no
> repetitive bending, no kneeling as a
> permanent restriction for this patient.
> Referral to Dr. Singh in pain management for
> selective nerve root blocks.

(*Id.*)

Dr. DiSimone completed a Medical Opinion Questionnaire on May 9, 2017, which reflected his April 19th plan. (R. 393-95.) He also opined that Plaintiff could sit, stand/walk for less than two hours total in an eight-hour day; she may need a cane or other assistive device while engaging in occasional standing/walking; she could use her hands to grasp, turn, and twist objects fifty percent of the time; she could use her fingers for fine manipulation fifty percent of the time; and she could use her arms for overhead reaching twenty percent of the time. (R. 393-94.)

On the same day, Plaintiff saw Christine Tofts, D.O., at Guthrie for her annual physical. (R. 415.) Plaintiff reported knee and back pain and noted that she had a pain management referral for June. (*Id.*) Physical exam did not show tenderness, but Plaintiff was stiff to stand from a seated position. (R. 418.)

On June 28, 2017, Plaintiff saw Rohit Singh, M.D., a pain management specialist for low back pain which she reported to be persistent and moderate to severe in intensity, rating it at 7-

11

8/10. (R. 424.) Plaintiff reported that the pain became worse after her left knee surgery. (*Id.*) Physical exam showed a normal gait; muscle spasm of the lumbar spine and moderate pain with range of motion; mild pain with motion of both knees; paravertebral and paraspinal tenderness; SI joint tenderness; single leg raise limited bilaterally without lateralization; and no evidence of calf muscle atrophy or hypertrophy. (R. 426.) He diagnosed lumbar region spinal stenosis with neurogenic claudication; radiculopathy of the lumbosacral region; spondylolisthesis at L5-S1; and chronic knee pain. (R. 427.) Dr. Singh adjusted Plaintiff's medication regimen, planned to initiate a series of injections for the spinal stenosis and radiculopathy, and planned aquatherapy for the spondylolisthesis. (*Id.*)

**B.  ALJ Hearing**

At the August 2, 2017, hearing, Plaintiff testified that lower back pain was her main problem. (R. 71.) She said she always had pain which she rated at 7/10 without medication and 5/10 with it. (R. 72.) She described the pain as radiating from her back to her legs and explained that it affected her ability to walk for more than a block, stand for more than one hour, sit form more than an hour, climb more than a flight of stairs, and lift anything more than ten pounds. (R. 74-76, 77.) Plaintiff also testified about pushing and pulling difficulties as well as postural limitations due to pain. (R. 76-77.) She talked about activities of daily

living, ability to do certain household chores, and her difficulty doing others because of pain. (R. 79-88.)

Following Plaintiff's testimony, ALJ Balutis asked vocational expert Josephine Doherty to consider a hypothetical individual of Plaintiff's age, education, and vocational background

> restricted to a light exertional level with the following additional restrictions: posturally this person could . . . [n]ever climb ladders, ropes, and scaffolds, and never crawl. All of the remaining postural movements would be occasional. For the record, it's climb ramps and stairs, balance, stoop, kneel, and crouch.
>
> Environmentally this person would have frequent exposure to unprotected heights, moving mechanical parts, extreme cold, and vibration.
>
> Pushing and pulling would be limited on the right lower extremity to frequent.

(R. 91-92.) When asked whether this individual would be able to perform any of Plaintiff's past work, Ms. Doherty responded that she would be able to perform the phlebotomist position both as performed and according to the DOT. (R. 92.) If the individual were limited to standing and walking for a total of four hours in an eight-hour day, Ms. Doherty said the person could not perform past relevant work. (R. 93-94.)

## C.    *ALJ Decision*

With his September 20, 2017, decision, ALJ Balutis found that Plaintiff had the following severe impairments: status post right total knee replacement (2014); osteoarthritis of the left knee,

status post left total knee replacement (2017); spondylolisthesis at L5-S1; spinal stenosis with neurogenic claudication; lumbosacral radiculopathy; and obstructive sleep apnea. (R. 24.) He concluded Plaintiff did not have an impairment or combination of impairments that met or equalled the severity of a listed impairment. (R. 25.) ALJ Balutis then determined Plaintiff had the residual functional capacity ("RFC") to perform light work except she "should never climb ladders, ropes and scaffolds or crawl. She could occasionally climb ramps and stairs, balance, kneel, stoop or crouch. The claimant could have frequent exposure to unprotected heights, moving mechanical parts, extreme cold and vibration. She could frequently push/pull with the right lower extremity." (R. 25.)

With this RFC, the ALJ concluded Plaintiff was capable of performing past relevant work as a phlebotomist. (R. 29.) He then found that Plaintiff had not been under a disability as defined in the Social Security Act from February 1, 2014, through the date of the decision. (*Id.*)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[1] It is necessary for the

---

[1] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C.

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the

---

§ 423(d)(1)(A). The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step four of the sequential evaluation process when the ALJ found that Plaintiff could perform her past relevant work as a phlebotomist. (R. 29.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

This oft-cited language is not . . . a

talismanic or self-executing formula for
adjudication; rather, our decisions make
clear that determination of the existence *vel
non* of substantial evidence is *not* merely a
quantitative exercise. A single piece of
evidence will not satisfy the substantiality
test if the Secretary ignores, or fails to
resolve, a conflict created by countervailing
evidence. Nor is evidence substantial if it
is overwhelmed by other evidence--
particularly certain types of evidence (e.g.,
that offered by treating physicians)--or if
it really constitutes not evidence but mere
conclusion. *See* [*Cotter*, 642 F.2d] at 706
("'Substantial evidence' can only be
considered as supporting evidence in
relationship to all the other evidence in the
record.") (footnote omitted). The search for
substantial evidence is thus a qualitative
exercise without which our review of social
security disability cases ceases to be merely
deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the ALJ to

analyze all probative evidence and set out the reasons for his

decision. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d

Cir. 2000) (citations omitted). If he has not done so and has not

sufficiently explained the weight given to all probative exhibits,

"to say that [the] decision is supported by substantial evidence

approaches an abdication of the court's duty to scrutinize the

record as a whole to determine whether the conclusions reached are

rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir.

1979). In *Cotter*, the Circuit Court clarified that the ALJ must

not only state the evidence considered which supports the result

but also indicate what evidence was rejected: "Since it is apparent

17

that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .")). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where a claimed error would not affect the outcome of a case, remand is not required. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005). Finally, an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

As set out above, Plaintiff asserts the Acting Commissioner's determination should be remanded because the ALJ erred in his assessment of medical expert opinions which limited Plaintiff to sedentary or less-than-sedentary work and substituted his lay judgment for these opinions. (Doc. 9 at 5.) Defendant responds that substantial evidence supports the ALJ's evaluation of medical evidence. (Doc. 10 at 15.) The Court concludes Plaintiff has satisfied her burden of showing error on the basis alleged.

Plaintiff points to the opinion of two treating physicians, Dr. Golobek and Dr. DiSimone, and an examining physician, Dr. Jenouri, which limited her to less-than sedentary work level. (Doc. 9 at 6.) She maintains the ALJ erred in finding she could do light work "[d]espite this overwhelming, consistent, and uncontroverted evidence." (*Id.*) Plaintiff avers the ALJ reached his conclusion based on "his own lay judgment and non-medical interpretation of the medical evidence." (*Id.*)

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight.[2] *See*, *e.g.*,

---

[2] Though not applicable here, the regulations have eliminated the treating source rule for claims filed on or after March 27, 2017, and in doing so have recognized that courts reviewing claims have "focused more on whether we sufficiently articulated the weight we gave treating source opinions, rather than on whether substantial evidence supports our decision." 82 FR 5844-01, 2017 WL 168819, *at 5853 (Jan. 18, 2017). The agency further stated

*Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20

C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d

Cir. 1981)).  Sometimes called the "treating physician rule," the

principle is codified at 20 C.F.R. § 404.1527(c)(2), and is widely

accepted in the Third Circuit.  *Mason v. Shalala*, 994 F.2d 1058 (3d

Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986).

The regulation addresses the weight to be given a treating source's

opinion: "If we find that a treating source's opinion on the

issue(s) of the nature and severity of your impairment(s) is well-

supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other

substantial evidence in your case, we will give it controlling

weight."  20 C.F.R. § 404.1527(c)(2).[3]  "A cardinal principle

that in its experience in adjudicating claims using the treating
source rule since 1991, the two most important factors for
determining persuasiveness are consistency and supportability,
which is the foundation of the new regulations.  *Id.*  Therefore,
the new regulations contain no automatic hierarchy for treating
sources, examining sources, or reviewing sources, but instead,
focus on the analysis of these factors.  *Id.*  20 C.F.R. § 404.1520c
addresses the evaluation of opinion evidence for cases filed on or
after March 27, 2017.

    [3] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

            Generally, we give more weight to opinions from
            your treating sources, since these sources are
            likely to be the medical professionals most
            able to provide a detailed, longitudinal
            picture of your medical impairment(s) and may
            bring a unique perspective to the medical
            evidence that cannot be obtained from the
            objective medical findings alone or from
            reports of individual examinations, such as

guiding disability eligibility determinations is that the ALJ

accord treating physicians' reports great weight, especially when

their opinions reflect expert judgment based on continuing

observation of the patient's condition over a prolonged period of

time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)

(citations omitted); *see also Brownawell v. Commissioner of Social

Security*, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to reject

the treating physician's assessment, an ALJ may not make

"speculative inferences from medical reports and may reject a

treating physician's opinion outright only on the basis of

contradictory medical evidence and not due to his or her own

credibility judgments, speculation or lay opinion." *Morales*, 225

F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir.

1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

consultative examinations or brief
hospitalizations. If we find that a treating
source's opinion on the issue(s) of the nature
and severity of your impairment(s) is well-
supported by medically acceptable clinical and
laboratory diagnostic techniques and is not
inconsistent with the other substantial
evidence in your case record, we will give it
controlling weight. When we do not give the
treating source's opinion controlling weight,
we apply the factors listed in paragraphs
(c)(2)(i) and (c)(2)(ii) of this section, as
well as the factors in paragraphs (c)(3)
through (c)(6) of this section in determining
the weight to give the opinion. We will always
give good reasons in our notice of
determination or decision for the weight we
give your treating source's opinion.

Pursuant to 20 C.F.R. § 404.1527(c)(2), an ALJ must assign controlling weight to a well-supported treating medical source opinion unless the ALJ identifies substantial inconsistent evidence. SSR 96-2p explains terms used in 20 C.F.R. § 404.1527 regarding when treating source opinions are entitled to controlling weight. SSR 96-2p, 1996 WL 374188, at *1. For an opinion to be "well-supported by medically acceptable clinical and laboratory diagnostic techniques," 28 U.S.C. § 404.1527(c)(2), "it is not necessary that the opinion be fully supported by such evidence"--it is a fact-sensitive case-by-case determination. SSR 96-2p, 1996 WL 374188, at *2. It is a determination the adjudicator must make "and requires an understanding of the clinical signs and laboratory findings in the case record and what they signify." *Id.* Similarly, whether a medical opinion "is not inconsistent with the other substantial evidence in your case record," 28 U.S.C. § 404.1527(c)(2), is a judgment made by the adjudicator in each case. SSR 96-2p, 1996 WL 374188, at*3. The ruling explains that

> [s]ometimes, there will be an obvious
> inconsistency between the opinion and the
> other substantial evidence; for example, when
> a treating source's report contains an
> opinion that the individual is significantly
> limited in the ability to do work-related
> activities, but the opinion is inconsistent
> with the statements of the individual's
> spouse about the individual's activities, or
> when two medical sources provide inconsistent
> medical opinions about the same issue. At
> other times, the inconsistency will be less
> obvious and require knowledge about, or
> insight into, what the evidence means. In

22

> this regard, it is especially important to
> have an understanding of the clinical signs
> and laboratory findings and any treatment
> provided to determine whether there is an
> inconsistency between this evidence and
> medical opinions about such issues as
> diagnosis, prognosis . . . , or functional
> effects.  Because the evidence is in medical,
> not lay, terms and information about these
> issues may be implied rather than stated,
> such inconsistency may not be evidence
> without an understanding of what the clinical
> signs and laboratory findings signify.

SSR 96-2P, 1996 WL 374188, at *3.  The ruling further provides that additional development may be needed to determine the appropriate weight assigned a treating source opinion, "for example, to obtain more evidence or to clarify reported clinical signs or laboratory findings." *Id.* at *4.  In contrast to those cases where the record is adequately developed, SSR 96-2p specifically states that the ALJ or Appeals Council "may need to consult a medical expert to gain more insight into what the clinical signs and laboratory findings signify in order to decide whether a medical opinion is well-supported or whether it is not consistent with the other substantial evidence in the case record." *Id.*

Importantly, the weight assigned a treating source's opinion must be fully explained in the ALJ's decision: when the decision is not fully favorable, it "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the

23

adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5; *see also* 20 C.F.R. § 404.1527(c)(2); 20 C.F.R. § 416.927(c)(2). The requirement that an ALJ provide a degree of specificity in support of his conclusions cannot be satisfied by general statements or broad reference to exhibits of record. *See*, *e.g.*, *Gross v. Comm'r of Soc. Sec.*, 653 F. App'x 116, 121-22 (3d Cir. 2016) (not precedential). Overall, SSR 96-2p, relevant regulations, and caselaw reinforce the need for careful review of an ALJ's decision to discount a treating source opinion, with particular attention paid to the reasons for discounting the opinion and the nature of the evidence either cited as contradictory or otherwise relied upon by the ALJ.[4]

Factors used to determine the weight properly attributed to an

---

[4] Consistent with SSR 96-2p's explanation of regulatory terms, Third Circuit caselaw indicates that "lay reinterpretation of medical evidence does not constitute 'inconsistent . . . substantial evidence.'" *Carver v. Colvin*, Civ. A. No. 1:15-CV-00634, 2016 WL 6601665, at *16 (M.D. Pa. Sept. 14, 2016) (citing *Gober v. Matthews*, 574 F.2d 772, 777 (3d Cir. 1978); *Frankenfeld v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988); *Doak v. Heckler*, 790 F.2d 26, 29-30 (3d Cir. 1986); *Ferguson v. Schweiker*, 765 F.2d 31, 36-37 (3d Cir. 1985); *Kent v. Schweiker*, 710 F.2d 110, 115 (3d Cir. 1983); *Van Horn v. Schweiker*, 717 F.2d 871, 874 (3d Cir. 1983); *Kelly v. Railroad Retirement Bd.*, 625 F.2d 486, 494 (3d Cir. 1980); *Rossi v. Califano*, 602 F.2d 55, 58-59 (3d Cir. 1979); *Fowler v. Califano*, 596 F.2d 600, 603 (3d Cir. 1979)). Thus, the reviewing court should disregard medical evidence cited as contradictory if it is really lay interpretation or judgment rather than that of a qualified medical professional. *See*, *e.g.*, *Carver*, 6601665, at *11.

24

examining source opinion are similar to those applied to a treating source opinion, including supportability, consistency, specialization, as well as the amount of understanding the source has of Social Security disability programs and their evidentiary requirements. 20 C.F.R. § 404.1527(c); 20 C.F.R. § 416.927(c).

Reviewing the ALJ's decision on relevant opinions of record in the legal framework set out above shows that ALJ Balutis did not provide detailed reasons for the weight assigned any opinion at issue here. (R. 28.) He found Dr. Golobek's October 2015 opinion entitled to little weight because it was "not supported by any objective findings," and the restrictions were not supported by "the longitudinal medical evidence of record." (*Id.*) ALJ Balutis did not provide an explanation of why medical evidence was not supportive of the opinion or point to any evidence which contradicted it. (*Id.*) He assigned partial weight to Dr. Golobek's January 2016 opinion for the same reasons. (*Id.*)

Despite the lack of explanation in his review of Dr. Golobek's opinions, ALJ Balutis noted elsewhere in his general review of evidence that Dr. Golobek found no restrictions to Plaintiff returning to work in May 2014 and in August 2014 he said he would see her in one year. (R. 26 (citing Ex. 1F [R. 249-91]).) The record contains no contact between Plaintiff and Dr. Golobek from the August 2014 office visit to his October 2015 opinion. *See supra* pp. 4-5. In August 2014, Plaintiff was "doing excellent,"

and three months earlier Dr. Golobek had cleared her to return to work without restriction as a phlebotomist, which is a light duty position as performed (R. 29, 91, 278, 279); in October 2015, Dr. Golobek opined that Plaintiff was capable of performing less than sedentary work (R. 318-20). Similarly, evidence of record does not show that Dr. Golobek evaluated Plaintiff between his October 2015 opinion and his January 2016 opinion.[5] *See supra pp. 5-6.*

Reading the decision as a whole, the Court concludes the ALJ's error in not providing the required specificity would be harmless because this is a case where there is "an obvious inconsistency between the opinion and the other substantial evidence," SSR 96-2p, 1996 WL 374188, at *3. *See Albury v. Comm'r of Soc. Sec.*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless) (citing *Burnett v. Commissioner*, 220 F.3d 112, 119 (3d Cir. 2000). Specifically, it is obviously inconsistent for Dr. Golobek to opine that Plaintiff was capable of less than sedentary work when he had not seen her for over a year and had cleared her for light duty work without restriction prior to when he last examined her. (R. 278,

---

[5] Although Plaintiff saw Dr. Golobek in February 2016 with complaints of knee and back pain (R. 502), there is no indication that he was aware of these complaints when he completed the January 2016 form opinion.

279, 318-20, 336-38.)  With this obvious inconsistency which shows that Dr. Golobek's opinions lack the support required to be assigned controlling or significant weight, 20 C.F.R. § 404.1527(c); 20 C.F.R. § 416.927(c), remand for reconsideration of the weight assigned the opinions is not warranted.

ALJ Balutis gave little weight to Dr. DiSimone's opinion regarding Plaintiff's physical limitations.[6]  (R. 28 (citing Ex. 9F [R. 393-95]).)  He did so because he concluded Dr. DiSimone's findings in the questionnaire that Plaintiff "would be limited to less than a full range of sedentary work [were] not well supported by the overall objective medical evidence of record."  (R. 28.)

As with the his assessment of Dr. Golobek's opinions, the general statement explaining the weight assigned Dr. DiSimone's opinion does not satisfy the ALJ's obligation to provide specific reasons for discounting the opinion.  SSR 96-2p, 1996 WL 374188, at *5; see also 20 C.F.R. § 404.1527(c)(2); 20 C.F.R. § 416.927(c)(2).  ALJ Balutis does not explain why the overall medical evidence of record does not support the opinion or cite evidence which he finds contradicts it.  (R. 28.)

However, unlike the assessments of Dr. Golobek's opinions, the Court cannot find the error harmless because the court is unable to

---

[6]  Although he reviewed the Physical Activities form completed by Dr. DiSimone on May 9, 2017, ALJ Balutis did not review the limitations expressed in Dr. DiSimone's Patient Plan contained in the April 19, 2017, office notes (R. 388).  (See R. 27-28.)

conduct meaningful judicial review of the determination.  *See*
*Albury*, 116 F. App'x at 330.  At the office visit where Dr.
DeSimone's Patient Plan included limitations consistent with those
identified in the questionnaire less than a month later, Dr.
DiSimone reviewed several diagnostic findings which he indicated
supported his assessments.  (R. 388.)  As noted above, ALJ Balutis
does not cite medical evidence or opinion contradicting Dr.
DiSimone's analysis or determinations, and the Court does not find
inherent inconsistencies in the record as was the case with Dr.
Golobek's opinions.  Without an explanation as to why the
diagnostics and clinical findings did not support Dr. DiSimone's
assessed limitations, the Court cannot find the ALJ's conclusions
are based on substantial evidence.  With no obvious inconsistencies
and no analysis, the Court agrees with Plaintiff that the ALJ
appears to have improperly relied on his own lay judgment in
rejecting Dr. DiSimone's opinion and crafting the RFC.[7]  *Morales*,

_____

[7]    The parties engage in discussion of whether an ALJ must
base the residual functional capacity determination on a medical
opinion setting out the functional capabilities of the claimant:
Plaintiff maintains that such an opinion is required pursuant to
*Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir. 1986), (Doc. 9 at 7; Doc.
11 at 2-3); Defendant contends Plaintiff's reliance on *Doak* is
misplaced and a specific medical opinion setting out the functional
capabilities found in the RFC is not necessary (Doc. 10 at 17-19, &
n.4 (citing *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 362 (3d
Cir. 2011); *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir.
2006); *Butler v. Colvin*, Civ. A. No. 3:15-CV-1923, 2016 WL 2756268,
at *13 n.6 (M.D. Pa. May 12, 2016))).

       Focusing on whether substantial evidence supports the ALJ's
decision in this case, the Court does not adopt a *per se* rule that
the precise functional limitations found by the ALJ must be based
on a medical opinion or specific medical finding.

225 F.3d at 317. Therefore, this matter must be remanded for further consideration of Dr. DiSimone's opinions.

Finally, the ALJ's assignment of partial weight to Dr. Jenouri's opinion is problematic for similar reasons. (R. 28.) As with Dr. DiSimone, Dr. Jenouri found Plaintiff capable of less than sedentary work. (R. 326-31.) Though the ALJ's conclusion that Plaintiff had the RFC for light work shows that he rejected Dr. Jenouri's specific findings which limited Plaintiff to less than sedentary work, ALJ Balutis provided no explanation as to what he meant by "partial weight." (*See* R. 28.) He stated only that he gave partial weight to the opinion "because [Dr. Jenouri] was relying solely and exclusively on one observation made on the day of the examination and not upon long-term observations and examinations of the claimant." (R. 28.) The Court cannot find this rationale adequate: if it were a sufficient reason to discount the opinion of a consultative examiner who conducted the examination and rendered the opinion at the request of the Bureau of Disability Determination, then engaging the services of the consultant would be pointless as, by nature and design, the evaluation is a single-encounter. Therefore, Dr. Jenouri's opinion must be further considered upon remand.

## V. Conclusion

For the reasons discussed above, the Court concludes this matter is properly remanded to the Acting Commission for further

29

action consistent with this opinion.  An appropriate Order is filed

simultaneously with this Memorandum.


                                    S/Richard P. Conaboy
                                    RICHARD P. CONABOY
                                    United States District Judge

DATED: October 24, 2018